IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ROBERT FLORES, Individually    §
and d/b/a TXCAT, and TXCAT     §
CONVERTER RECYCLING, INC.,     §
                               §
     Plaintiffs,               §
                               §
v.                             §        CIVIL ACTION NO. H-10-5143
                               §
PHOENIX GROUP METALS,          §
L.L.C., et al.,                §
                               §
     Defendants.               §

## MEMORANDUM, RECOMMENDATION, AND ORDER

Pending before the court[1] are one dispositive motion and two nondispositive motions filed by Defendants Phoenix Group Metals, LLC ("Phoenix Group"); CMS/Morrell Holdings, LLC ("CMS"); PGM 1, LLC d/b/a Phoenix Automotive Cores ("PAC"); and Jay Robie ("Robie") (collectively "Defendants"): 1) Motion for Summary Judgment (Doc. 50); 2) Motion to Strike or Exclude the Expert Testimony of James M. Trippon ("Trippon") (Doc. 51); and 3) Motion to Strike or Disregard the Affidavit of Susan Benton ("Benton") (Doc. 57). The court has considered the motions, the responses, all other relevant filings, and the applicable law. For the reasons set forth below, the court **RECOMMENDS** that Defendants' motion for summary judgment be **GRANTED**. Defendants' motion to strike Benton's affidavit is

---

[1]    This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72.  Doc. 7.

**GRANTED**, and their motion to exclude Trippon's testimony is **DENIED AS MOOT**.

## I.  Case Background

Plaintiffs Robert Flores ("Flores"), Robert Flores d/b/a TXCAT ("Flores d/b/a TXCAT"), and TXCAT Converter Recycling, Inc. ("TCRI") (collectively "Plaintiffs") filed this business disparagement lawsuit against Defendants in state court. Defendants timely removed the case to this court.

### A.  Factual Background

In 2006, Plaintiff Flores and Kevin Mills ("Mills") entered a verbal partnership agreement and began an automotive recycling business under the trade name TXCAT, which primarily engaged in buying and selling catalytic converters.[2] In 2007, Claxton Recycling, Inc., ("Claxton") began loaning the business money on a revolving basis.[3] In mid-2008, Mills effectively withdrew from the partnership but returned part time the following year. [4] He completely withdrew from the company during 2009.[5] In January 2010, Plaintiff Flores incorporated Plaintiff TCRI.[6]

Defendant Robie is the chief executive officer of Defendant

---

[2]    Doc. 52-2, Ex. 4 to Defs.' Mot. for Summ. J., Pl. Flores' Dep. pp. 35-36, 40-41.

[3]    Id. pp. 62-66.

[4]    Doc. 52-3, Ex. 4 to Defs.' Mot. for Summ. J., Pl. Flores' Dep. pp. 74-75.

[5]    Id. pp. 86-88.

[6]    Id. p. 100.

PAC, a subsidiary of Defendant Phoenix Group, which was at the time a holding company owned in part by Defendant CMS. [7]   In 2009, Defendant Robie was named the chair of Automotive Parts Remanufacturers Association, Core Suppliers Advisory Council.[8]   The defendant companies are generally in the business of recycling automotive parts and scrap metal.[9]

In the fall of 2009, an agent of Plaintiffs met the owner of a Connecticut recycling business and pitched the sale of catalytic converters owned by Plaintiff Flores.[10]   When the shipment arrived in Connecticut on October 26, 2009, the owner made a telephone call and then refused to buy the converters. [11]   After some discussion with the owner and a phone conversation with Plaintiff Flores, Plaintiffs' agent  arranged to ship the converters back to Texas.[12]   After its return, the load of catalytic converters was sold to other buyers.[13]

On October 26, 2009, Defendant Robie sent an email ("October Email") with the subject "Cat fraud" to eleven individuals in the

---

[7]     Doc. 52-13, Ex. 12 to Defs.' Mot. for Summ. J., Def. Robie's Aff. ¶ 3.

[8]     Id. ¶ 2.

[9]     See id. ¶ 4; Docs. 52-19 & 52-20, Ex. 13 to Defs.' Mot. for Summ. J., Def. Robie's Dep. pp. 15, 32.

[10]     See Doc. 55-7, Ex. 5 to Pls.' Resp to Defs.' Mot. for Summ. J., Jose Martinez' Dep. pp. 15, 18, 23, 29.

[11]     Id. pp. 18-19, 40, 42.

[12]     Id. pp. 40, 42-46.

[13]     Doc. 55-2, Ex. 1 to Pls.' Resp to Defs.' Mot. for Summ. J., Pl. Flores' Dep. pp. 169-170.

industry:

Gentlemen,

You  should be aware of a fraudulent scam that is attempting to be perpetrated against our industry.  A trailer load of low grade converters is being peddled by three men possibly from the Houston area.  All the info I have right now are the first names of three men who may work for a company named XT Cat.  Their names are Jose, Bob and Kevin.  I have friends in law enforcement and expect more info on this soon.  I am passing this on as a professional courtesy to beware of this scam.  If you have any insight or information on who these people may be please call with details.  I intend to rain down hell on these lowlifes.  If you would like to assist you can call me at the number below.[14]

The email was signed by Defendant Robie with an address at CMS Recycling Park in Arizona.[15]  The email contained logos for "PAC-Cores," and Defendants CMS and PAC.[16]

Attached to the email was a letter dated October 26, 2009, addressed to the freight company that shipped the converters back to Texas ("Freight Letter").[17]  The letter stated:

To whom it may concern,

You recently provided a freight quote for material to be picked today [sic].

This material is considered fraudulent in nature and may be linked with criminal activity.  The authorities have been alerted.

Shipper:      RR Recycling
              27 Cooper Street, Meriden CT

---

[14]     Doc. 52-19, Ex. 12-D to Defs.' Mot. for Summ. J., Email from Def. Robie to Eleven Recipients Dated Oct. 26, 2009; see also Doc. 52-13, Ex. 12 to Defs.' Mot. for Summ. J., Def. Robie's Aff. ¶ 9.

[15]     See Doc. 52-19, Ex. 12-D to Defs.' Mot. for Summ. J., Email from Def. Robie to Eleven Recipients Dated Oct. 26, 2009.

[16]     See id.

[17]     See id.

4

Consignee:      TXCAT
                   6355 Long Drive, Houston TX

Shipper contract: 31159395

If you know who contracted this load please inform the authorities immediately when they contact you for questioning.  This shipment is being seized as we speak. Suspects are three men with the names  Bob, Kevin, or Jose.  Surnames unknown.  May be linked with other catalytic converter recyclers in Houston area.[18]

The letterhead bore Defendant PAC's emblem and address, and Defendant Robie signed it as a representative of Defendant Phoenix Group.[19]  Although Defendant Robie sent the letter with his original email, he never actually sent it to the shipping company.[20]

On the same day, Defendant Robie directed a marketing representative of  Defendant PAC to email a newsletter ("Newsletter") to 127 of Defendant PAC's "friends, loyal customers, and respected competitors."[21]  On October 29, 2009, the Newsletter was published online at Defendant Robie's direction.[22]  The newsletter was entitled "A Special Letter from Phoenix Automotive Cores" and contained, in the context of warning about scams involving European catalytic converters that contain no precious metals, the following information referencing the attempted sale by Plaintiff Flores:

On Monday October 26th, one of our customers in New

---

[18]    Id.

[19]    See id.

[20]    Doc. 52-13, Ex. 12 to Defs.' Mot. for Summ. J., Def. Robie's Aff. ¶ 9.

[21]    Id. ¶ 10.

[22]    Id.

England made arrangements to buy several thousand
converters from a guy he did not know.  Fortunately he
called to ask our help in the deal.  Before the purchase
he sent us pictures of the material[,] and we immediately
recognized it as low grade catalyst.  He would have
suffered about two hundred thousand dollars in losses.
How many of those can any of us take?  We do not know the
company involved in this scam.  What we do know is that
there are three names that may have some connection to
this.  The first man was identified as Jose Martinez and
has some business relationship to a Kevin and Bob from
the Houston area.  Since all name[s] are very common it
will take some time to identify them.[23]

Defendant Robie also emailed Techemet, Inc., one of

Plaintiffs' vendors, whom he believed to be behind the alleged

scam.[24]  Stewart Prentice ("Prentice"), of Techemet, Inc., and

Defendant Robie communicated via telephone a few days later.[25]

Prentice denied any involvement in the attempted sale on October

26, 2009.[26]

On October 29, 2009, Defendant Robie emailed Claxton via its

website ("Claxton Email"), stating:

The load of converters you are receiving today have [sic]
been used in an attempt to defraud unsuspecting buyers.
I know that you try to do legitimate business[,] and that
is a good testament to the Claxton family.  I know that
you have helped Bob financially in the past and your good
deeds are remembered.  Therefore I am encouraging you to
divert this load from your facility to avoid being
complicit.

Ignorance of the law is not an excuse.  The compelling
evidence shows a paper trail from Houston to Connecticut
and now to you???

---

[23]     Doc. 52-19, Ex. 12-F to Defs.' Mot. for Summ. J., Online Newsletter.

[24]     Docs. 55-5 & 55-6, Ex. 4 to Pls.' Resp. to Defs.' Mot. for Summ. J.,
Def. Robie's Dep. pp. 180, 219.

[25]     Doc. 55-6, Ex. 4 to Pls.' Resp. to Defs.' Mot. for Summ. J., Def.
Robie's Dep. pp. 229-30.

[26]     Id. pp. 230-31.

The net is large and the catch will be great![27]
In November 2009, Plaintiffs' counsel sent Defendants a cease-and-desist letter regarding the content of the emails.[28]  Defendant Robie, in turn, emailed Plaintiffs' letter to a number of individuals.[29]

On February 18, 2010, Mills emailed Plaintiff Flores the Newsletter (without the photographs that were included in the original) bearing the typewritten date of "12/11/2009" beneath the article ("February Email").[30]  Mills testified that a third party had given Mills that exact copy of the Newsletter and he forwarded to Plaintiff Flores via email.[31]  Mills never saw the original and did not know the original source of the copy.[32]

## B.  **Procedural Background**

Prior to filing this lawsuit, a similar lawsuit had been filed in Texas state court in Harris County on December 21, 2009, naming "TXCAT" as its sole plaintiff.[33]  That suit was removed to federal

---

[27]    Doc. 52-19, Ex. 12-G to Defs.' Mot. for Summ. J., Email from Def. Robie to Claxton Dated Oct. 29, 2009; see also Doc. 52-13, Ex. 12 to Defs.' Mot. for Summ. J., Def. Robie's Aff. ¶ 11.

[28]    See Doc. 55-6, Ex. 4 to Pls.' Resp. to Defs.' Mot. for Summ. J., Def. Robie's Dep. pp. 271, 290.

[29]    See Doc. 55-6, Ex. 4 to Pls.' Resp. to Defs.' Mot. for Summ. J., Def. Robie's Dep. p. 271.

[30]    See Doc. 52-26, Ex. 22 to Defs.' Mot. for Summ. J., Email from Mills to Pl. Flores Dated Feb. 18, 2010.

[31]    Doc. 52-11, Ex. 10 to Defs.' Mot. for Summ. J., Mills' Dep. pp. 174-76.

[32]    Id. p. 177.

[33]    See generally TXCAT v. Phoenix Grp. Metals, LLC, No. H-10-0344, 2010 WL 5186824 (S.D. Tex. Dec. 14, 2010).

court where it was dismissed because TXCAT, an unincorporated business, lacked standing.[34]

Plaintiffs instituted the present suit in state court on November 25, 2010, nineteen days before the previous suit was dismissed.[35] Defendants removed this case on December 22, 2010.[36] Originally, Plaintiffs alleged four causes of action against Defendants: (1) libel; (2) business disparagement; (3) tortious interference with prospective business relations; and (4) tortious interference with an existing contract.[37] During the course of litigation before this court, Plaintiffs have amended once without leave of court and have sought leave to amend on two other occasions.[38] The court granted Plaintiffs leave on the second occasion and denied as moot their first request.[39] In the amendment, Plaintiffs added a claim for conspiracy as to all four counts and clarified certain aspects of their other claims.[40]

---

[34]     See id.  The court in TXCAT noted that a dismissal under Federal Rule of Civil Procedure 12(b)(1) is without prejudice, and accordingly dismissed the suit as such.  See TXCAT, 2010 WL 5186824, at *6, *9 (citing Sepulvado v. La. Bd. of Pardons & Parole, 114 Fed. App'x 620, 622 (5th Cir. 2004)(unpublished)).

[35]     See Doc. 1-3, Ex. B to Defs.' Notice of Removal, Pls.' Orig. Pet.; see also TXCAT, 2010 WL 5186824, at *1.

[36]     See Doc. 1, Defs.' Notice of Removal.

[37]     See Doc. 1-3, Ex. B to Defs.' Notice of Removal, Pls.' Orig. Pet.

[38]     See Doc. 25, Order Dated July 15, 2011.

[39]     See id.

[40]     See Doc. 32, Pls.' 2nd Am. Compl.

In the meantime, Defendants filed two motions to dismiss.[41] In their second motion, Defendants incorporated all of their arguments from their first motion.[42]   In August 2011, the court addressed Defendants' motions to dismiss.[43]   The court denied Defendants' first motion as moot but considered the arguments contained therein in its analysis.[44]   In their arguments for dismissal, Defendants challenged Plaintiffs Flores d/b/a TXCAT and TCRI's standing to bring suit, challenged the libel, business disparagement, and tortious interference claims pertaining to the October communications as barred by limitations, and challenged the conspiracy claim as insufficiently pled.[45]   Defendants did not move to dismiss Plaintiffs' claims with respect to the February Email on the basis of statute of limitations.[46]

The court denied Defendants' motion based on standing but left open the possibility of challenging "whether and which claims were actually assigned to TCRI and whether TCRI is actually the

---

[41]     See Doc. 3, Defs.' 1st Mot. to Dismiss; Doc. 18, Defs.' 2nd Mot. to Dismiss.

[42]     See Doc. 18, Defs.' 2nd Mot. to Dismiss pp. 1-2.

[43]     See Doc. 26, Mem., Recommendation, & Order.

[44]     See Doc. 26, Mem., Recommendation, & Order p. 7; Doc. 30, Order Dated Sept. 7, 2011.

[45]     See generally Doc. 3, Defs.' 1st Mot. to Dismiss; Doc. 18, Defs.' 2nd Mot. to Dismiss.

[46]     See Doc. 3, Defs.' 1st Mot. to Dismiss pp. 12-16.

successor-in-interest to Plaintiff Flores d/b/a TXCAT."[47]   The court
granted Defendants' motion with regard to Plaintiffs' libel and
tortious interference claims pertaining to the October emails based
on limitations and with regard to Plaintiffs' conspiracy claim in
its entirety.[48]   The only claims remaining in the wake of the
court's ruling are Plaintiffs' libel and tortious interference
claims to the extent Plaintiffs based those claims on the February
Email and Plaintiffs' business disparagement claim.[49]

Shortly after the court adopted the Memorandum,
Recommendation, and Order, Defendants filed an answer to
Plaintiffs' live pleading.[50]   Defendants timely filed a motion for
summary judgment on June 15, 2012.[51]   On the same day, they filed
a motion to strike the testimony Plaintiffs' expert.[52]   After
Plaintiffs responded to the motion for summary judgment, Defendants
filed a second motion to strike, this one targeting an affidavit
Plaintiffs filed in support of their response.[53]

---

[47]    Doc. 26, Mem., Recommendation, & Order p. 12; Doc. 30, Order Dated
Sept. 7, 2011.

[48]    See Doc. 26, Mem., Recommendation, & Order pp. 16, 18, 20; Doc. 30,
Order Dated Sept. 7, 2011.

[49]    See generally Doc. 26, Mem., Recommendation, & Order; Doc. 30, Order
Dated Sept. 7, 2011.

[50]    See Doc. 34, Answer.

[51]    See Doc. 50, Defs.' Mot. for Summ. J.

[52]    See Doc. 51, Defs.' Mot. to Strike or Exclude the Expert Test. of
Trippon.

[53]    See Doc. 57, Defs.' Mot. to Strike or Disregard the Aff. of Benton.

All three of the pending motions are fully briefed and ready for court consideration.

## II. Defendants' Objections to Plaintiffs' Evidence

Defendants object to seven of Plaintiffs' exhibits. The court **SUSTAINS** three of the objections and **OVERRULES** one as explained below. The remaining three objections, related to Exhibits 11 (Benton's affidavit), 16 (Trippon's amended report), and 17 (Trippon's deposition excerpts), are **OVERRULED AS MOOT** in light of the conclusions reached by this court on the motions to strike Benton's affidavit and for summary judgment.

Defendants' objections to Exhibits 2 and 3, which are printouts of websites, are **SUSTAINED** on the basis that they are not properly authenticated. Fed. R. Evid. 901(a)(requiring authentication by "evidence sufficient to support a finding that the item is what the proponent claims it is"). Each of the documents contain a date and time, possibly but not explicitly identifying when it was printed. Neither document contains an internet domain address, and neither is supported by an affidavit verifying the originating web location. Exhibits 2 and 3 are **STRICKEN**.

Defendants' objections to Plaintiffs' Exhibit 15, which purports to be Plaintiffs' vendor transaction histories and general ledgers, are **SUSTAINED** on the basis that they are not properly authenticated and, absent context and explanation, are not

relevant.[54]   See Fed. R. Evid. 401 (defining relevant evidence as
that which contains facts "of consequence in determining the
action"), 901(a)(requiring authentication by evidence "that the
item is what the proponent claims it is").  Exhibit 15 is **STRICKEN**.

Defendants' objections to Exhibit 10, which purports to be an
internet record of an assumed name certificate filed with Harris
County, are **OVERRULED** on the basis that the document is a public
record.  See Fed. R. Evid. 803(8)(excepting records or statements
of a public office from the hearsay rule), 901(b)(7)(listing
evidence about public records as self-authenticating).  Although it
also lacks an internet domain address, the document appears to be
what Plaintiffs claim it is and to be trustworthy.  Defendants
present no evidence to the contrary.

**III.  Motion to Strike Benton Affidavit**

In addition to objecting to portions of Benton's affidavit as
inadmissible, Defendants also move to strike it in its entirety as
a sham affidavit.[55]   The court agrees with Defendants and strikes

---

[54]     To the extent that Plaintiffs submitted these records with the
purpose that the court should determine whether Plaintiffs' vendor list differed
from one year to the next, the court notes that it is not the court's job to sift
through evidence to find support for Plaintiffs' opposition. Fed. R. Civ. P.
56(c)(3); Malacara v. Garber, 353 F.3d 393, 405 (5th Cir. 2003).  Plaintiffs
generally refer to the lists without providing any specificity. See Doc. 55,
Pls.' Resp. to Defs.' Mot. for Summ. J. p. 50.  Moreover, the court's decision
below with regard to Plaintiffs' failure to connect any loss of vendors to the
alleged libelous material renders these records immaterial.

[55]     Defendants also seek sanctions pursuant to Federal Rule of Civil
Procedure 56(h), which allows the award of reasonable attorney's fees incurred
in responding to an affidavit introduced in bad faith or solely for delay. See
Turner v. Baylor Richardson Med. Ctr., 476 F.3d 337, 349 (5th Cir. 2007).
Although the court finds Benton's affidavit so blatantly contradicts her

Benton's affidavit based on the reasoning that follows.

Under the federal rules, affidavits supporting summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). A party cannot defeat summary judgment by introducing an affidavit that contradicts, without explanation, prior deposition testimony.[56] S.W.S. Erectors, Inc. v. Infax, Inc., 72 F.3d 489, 495 (5th Cir. 1996); see also Copeland v. Wasserstein, Perella & Co., Inc., 278 F.3d 472, 482 (5th Cir. 2002)(requiring an explanation when the only evidence creating a genuine issue of material fact to avoid summary judgment is an affidavit that conflicts with deposition testimony). Only if the explanation given is "sufficiently persuasive" should the court allow the change in testimony. Axxiom Mfg. Inc. v. McCoy Invs., Inc., 846 F. Supp.2d 732, 750 (S.D. Tex. 2012)(quoting EBC, Inc. v. Clark Bldg. Sys. Inc., 618 F.3d 253, 270 (3d Cir. 2010)).

Defendants focus on the portions of Benton's deposition and affidavit that concern "whether Plaintiffs have suffered any

---

testimony as to call into question its sincerity, the court has determined that striking the affidavit from the summary judgment evidence is sanction enough.

[56]     Although the Fifth Circuit has not specifically applied the rule to nonparty witnesses, the rule, as enunciated by the Fifth Circuit, lends itself to the interpretation that it applies to any affidavit introduced by the nonmoving party that contradicts the affiant's prior testimony. Cf. Dees v. Am. Med. Response, Inc., Civil Action No. 3:08cv265-HTW-LRA, 2010 WL 606454, at *3 (S.D. Miss. Feb. 17, 2010)(listing cases in other circuits that have extended the rule to nonparty witnesses).

damages as a result of Defendants' statements."[57]  In her deposition on February 15, 2012, Benton stated that, after publication of the statements at issue, she continued to back Plaintiff Flores financially, never refusing to make a loan and never reducing the amounts loaned.[58]  Benton went so far as to say that, although her trust in Plaintiff Flores faltered when she received Defendant Robie's letter, she believed Plaintiff Flores when he assured her that there was nothing to Defendants' statements and that she still trusted him as of the deposition date.[59]

Additionally, she testified that she never withdrew her support for building a smelter and would have funded it in the 2009-2010 time period if the money had been available.[60]  She further stated that the same held true for the time of her deposition, agreeing that nothing would stop her from helping Plaintiff Flores build a smelter.[61]  Yet, in 2009, according to Benton, no concrete steps, such as a agreeing to loan terms or

---

[57]     Doc. 57, Defs' Mot. to Strike or Disregard Aff. of Benton p. 2.

[58]     Doc. 57-1, Ex. A to Defs' Mot. to Strike or Disregard Aff. of Benton, Benton's Dep. pp. 34, 36.  Miguel Tirado ("Tirado"), Claxton's business manager, corroborated Benton's testimony that Claxton never decreased Plaintiffs' funding or denied it.  Doc. 52-23, Ex. 18 to Defs' Mot. for Summ. J. p. 61. Plaintiff Flores also testified that Claxton continued to loan Plaintiffs money without interruption.  Doc. 52-5, Ex. 4 to Defs' Mot. for Summ. J., Pl. Flores' Dep. pp. 236, 240.

[59]     Doc. 57-4, Ex. C to Defs' Mot. to Strike or Disregard Aff. of Benton, Benton's Dep. p. 63.

[60]     Id. pp. 59-61.

[61]     Id. p. 61.

14

obtaining permits, were taken toward financing and building the smelter.[62] The primary reasons, Benton explained, were that she did not have the money available and neither she nor Plaintiff Flores was ready to pursue a smelting enterprise.[63] Benton testified that she did not know how much money it would cost for Plaintiff Flores to add a smelter to his existing business.[64] Benton was consistent throughout her deposition on these points.

The following question-and-answer exchanges, among other similar ones, occurred regarding Benton's comprehension and truthfulness at the deposition:

> Q.   -- I'd like to ask you, do you feel comfortable that the testimony you've given today has been honest and correct to the best of your knowledge.
> A.   Absolutely
>
> . . . .
>
> Q.   . . . Did you understand me when I was asking you if you would continue to back Mr. Flores?
> . . . .
> A.   Yes.
> Q.   . . . Do you have any confusion about that question?
> A.   No.
> Q.   Is the answer -- is your answer that you would continue?
> A.   Yes.
>
> . . . .
>
> Q.   . . . And if you had the money available, would

----

[62]   Id. p. 65.

[63]   Id. pp. 67-68.

[64]   Id. p. 58.

-- would you continue to explore the option of building
a smelter?

. . . .

     A.   Yes, but my kids come first.
     Q.  . . . I -- I understand.  Are you confused by
that question?
     A.   No.
     Q.   When I asked you earlier about whether or not
Mr. Flores had convinced you, you know, to keep backing
him, did you understand my question?

. . . .

     A.   Your wording is a little strange, but,
        yes.

. . . .

     Q.  . . . And are you confused at all about that
question I'm asking you?
     A.   No.
     Q.   You understand it?
     A.   Yes.
     Q.   Okay.  And you're being truthful?
     A.   Yes.
     Q.   Okay.  When I asked you whether or not you had
decreased or not provided money requested if it was
available, did you understand that question?
     A.   Yes.
     Q.   Okay.  Is it confusing to you?
     A.   I have to think as to what you're saying and
repeat it to myself to an extent, yes.
     Q.   Okay.  But do you understand it now?
     A.   Yes.
     Q.   You're not confused now.
     A.   No.
     Q.   Okay.  And when you said that you had not -- if
you had the money, you gave him all that he asked for; is
that correct?
     A.   Yes.

. . . .

     Q.   Are you confused by that question?
     A.   No.

. . . .

    Q.   Do you understand what I'm saying?

. . . .

    A.   Yes.
    Q.   -- do you understand -- do you understand what
I'm saying?
    A.   Yes.
    Q.   You understand the question.
    A.   Uh-huh.
    Q.   Is that correct?
    A.   Yes.  Are you trying to confuse me now?
    Q.   No.  I'm trying to clarify as much as I can.
    A.   I'm as clear as I can possibly be.
    Q.    Okay.  And you feel pretty comfortable that
your answers are true and correct.
    A.   Yes.[65]

Benton's affidavit, which Plaintiffs submitted in response to

Defendants' summary judgment motion, was specifically intended "to

clarify or revise some of [her] deposition testimony so that it is

clear as to why [she] was and still [is] unwilling to fund the

expansion of [Plaintiff Flores'] business."[66]   In her affidavit,

Benton stated in direct contradiction to her deposition testimony:

    5.   . . . . I had and still have a concern that
[Plaintiff] Flores is involved in fraudulent activity. .
. . The communication from [Defendant] Robie has upset me
to the point that I am concerned about the business
relationship between Claxton Recycling and [TCRI].  The
threats contained in the communication from [Defendant]
Robie indicate to me that [Plaintiff] Flores was involved
in fraudulent activity and my continued investment in
[TCRI] may need to stop as I do not desire to be linked

---

[65]     Doc. 57-5, Ex. C to Defs.' Mot. to Strike or Disregard Aff. of
Benton, Benton's Dep. pp. 115, 120-21, 123-24.

[66]     Doc. 57-3, Ex. B to Defs.' Mot. to Strike or Disregard Aff. of
Benton, Benton's Aff. ¶ 4.

to a company that defrauds others.

6.    In 2009, I was in the process of preparing to loan up to $1,000,000.00 to [Plaintiff] Flores d/b/a TXCAT for the purpose of expanding the business.  The money was to be used to buy a new facility, hire more employees and build a smelter.

. . . .

7.    The reason that I told [Plaintiff] Flores, in October 2009 to the present, that I did not intend to loan him funds is because I have concerns over being able to trust [him]. . . . I simply decided that I could not trust [Plaintiff] Flores enough to loan him the funds needed to expand the business.  My deposition testimony that I did not have the money in February 2012 and would loan money to my children before [TCRI] is incorrect.  I have the funds to loan to [TCRI] for a smelter, which would likely cost less than $300,000.00. . . . [L]oaning money to [my children] is unrelated to my unwillingness to fund an expansion of [TCRI].

. . . .

8.    I do not trust [Plaintiff Flores] with such a loan due to [Defendant] Robie's communication dated October 29, 2012[sic[67]][,] and the allegations contained therein.

. . . .

9.    My continued business relationship with [Plaintiff] Flores is in serious doubt and I am not unsure [sic] how much longer I will continue to fund [TCRI's] purchase of catalytic converters.[68]

---

[67]    This is clearly a typographical error.  Benton's affidavit is dated July 9, 2012, three months prior to the date referenced as the date of Defendants' communication.   Doc. 57-3, Ex. B to Defs.' Mot. to Strike or Disregard Aff. of Benton, Benton's Aff. ¶ 5.

[68]    Id. ¶¶ 5-9.   The court also notes that Benton stated in her affidavit: "In May 2012, I decreased the normal amount of operating funding that Claxton Recycling is willing to provide to [TCRI] and am seriously considering stopping all further funding to [TCRI]."   Id. ¶ 5.   This statement does not directly contradict her deposition testimony because May 2012, when she claimed she decreased funding, was three months after her deposition testimony. Regardless, it carries no weight as evidence of special damages resulting from

By way of explanation for the vast difference between the deposition and affidavit testimony, Benton indicated that she had been on Hydrocodone since August 2011 and that the drug had "had the effect of making me forgetful and confused."[69]  She continued, "The side effect[s] of Hydrocodone and my other medications are made worse by anxiety, stress and unfamiliar situations."[70]  She claimed that she was "very anxious and confused" during her deposition and that her testimony was incorrect, particularly related to her "lack of willingness to fund the expansion of [Plaintiff Flores'] business."[71]

A line-by-line comparison is unnecessary to discern that Benton's affidavit drastically and obviously controverts (or, more precisely, guts) her deposition testimony on the issues of her trust in Plaintiff Flores and her willingness to continuing supporting his business following the communication from Defendants.  Thus, the affidavit should be stricken absent a sufficiently persuasive explanation for the turnabout.  Although Benton offers the explanation in her affidavit that her medication caused her to be confused at the deposition, it lacks credibility, much less persuasiveness.

---

Defendants' statements because it occurred more than two and a half years after the statements were published.

[69]    Id. ¶ 3.

[70]    Id.

[71]    Id. ¶ 4.

Benton claimed in her affidavit that she was anxious and confused at her deposition due to the side effects of her medication in combination with the stress of an unfamiliar situation. This assertion is not borne out by her repeated assurances, at her deposition, that she was not confused, that she was certain about her testimony, and that she was answering truthfully. Moreover, in her affidavit, Benton indicated that she had been on pain medication since August 2011, but, in her deposition, she stated that she had been on the same medication[72] since 2003 and always had suffered a certain amount of confusion.[73] She further testified at her deposition that she had recently lowered the dosage herself to improve her decision-making ability.[74] Finally, Plaintiffs' attorney specifically requested a copy of the transcript and an errata sheet for Benton's deposition,[75] but none was completed and returned. See Fed. R. Civ. P. 30(e)(1)(allowing thirty days for review of a deposition transcript upon request and an opportunity to list changes in form or substance with explanation).

Benton's affidavit directly contradicts her prior deposition

---

[72]    The medication is identified in the deposition transcript as "Hydrocodene" not Hydrocodone. Doc. 57-5, Ex. C to Defs.' Mot. to Strike or Disregard Aff. of Benton, Benton's Dep. pp. 129-30.

[73]    Id.

[74]    Id. p. 130.

[75]    See id. p. 136.

testimony without a persuasive explanation and, thus, is a sham affidavit and is **STRICKEN** its entirety.

### IV.   Summary Judgment Motion

Defendants move for summary judgment on all of Plaintiffs' causes of action.

### A.   Legal Standard

Summary judgment is warranted when the evidence reveals that no genuine dispute exists regarding any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Brown v. City of Houston, Tex., 337 F.3d 539, 540-41 (5th Cir. 2003).  A material fact is a fact that is identified by applicable substantive law as critical to the outcome of the suit.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Ameristar Jet Charter, Inc. v. Signal Composites, Inc., 271 F.3d 624, 626 (5th Cir. 2001).  To be genuine, the dispute regarding a material fact must be supported by evidence such that a reasonable jury could resolve the issue in favor of either party.  Anderson, 477 U.S. at 250; TIG Ins. Co. v. Sedgwick James of Wash., 276 F.3d 754, 759 (5th Cir. 2002).

The movant must inform the court of the basis for the summary judgment motion and must point to relevant excerpts from pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of genuine factual issues.  Celotex

21

Corp., 477 U.S. at 323; Topalian v. Ehrman, 954 F.2d 1125, 1131 (5th Cir. 1992).  If the moving party can show that the facts are not in dispute, the party opposing summary judgment must go beyond the pleadings and proffer evidence demonstrating that genuine issues of material fact do exist that must be resolved at trial.  See Celotex Corp., 477 U.S. at 324.

When considering the evidence, "[d]oubts are to be resolved in favor of the nonmoving party, and any reasonable inferences are to be drawn in favor of that party." Evans v. City of Houston, 246 F.3d 344, 348 (5th Cir. 2001); see also Boston Old Colony Ins. Co. v. Tiner Assocs. Inc., 288 F.3d 222, 227 (5th Cir. 2002).  The court should not "weigh evidence, assess credibility, or determine the most reasonable inference to be drawn from the evidence." Honore v. Douglas, 833 F.2d 565, 567 (5th Cir. 1987).

**B. Analysis**

Defendants' summary judgment motion presents twenty-one arguments.  The court addresses only a few, beginning with the standing issue and ending, after discussion of three other issues, in a decision that summary judgment should be granted as to the entire case.

**1. Standing**

Defendants challenge Plaintiffs' standing to bring suit, arguing that TXCAT and TCRI were not in existence on the date Plaintiffs filed the lawsuit and TXCAT does not exist today.  The

22

court agrees with regard to TCRI only.

Defendants' argument with regard to TXCAT focuses on the lack of evidence that such a corporation exists and refers to the dismissal of a prior lawsuit brought solely by TXCAT, an unincorporated business. In the current lawsuit, the court previously explained that the TXCAT plaintiff from the prior suit was not a party to this suit:

> At the outset, it is clear to the court that the "TXCAT" in the prior case, a so-called "nonexistent Texas corporation," is not the same plaintiff as Flores d/b/a TXCAT. Thus, there is no standing issue to determine with respect to "TXCAT" because TXCAT is not appearing in this suit as an entity separate from Flores.[76]

The court further explained that Plaintiff Flores d/b/a TXCAT does have standing to sue.[77] The court agrees with Defendants, however, on the issue of Plaintiff TCRI's standing to sue.

The court's jurisdiction covers only actual cases or controversies, and standing  is an element of the case-or-controversy requirement. U.S. Const. art. III § 2; Lujan v. Defenders of Wildlife, 504 U.S. 555, 559, 560 (1992); see also McCall v. Dretke, 390 F.3d 358, 361 (5th Cir. 2004)(explaining that standing is an essential component of federal subject matter jurisdiction). As a jurisdictional issue, "standing must be addressed before all other issues." Ford v. NYLCare Health Plans of Gulf Coast, Inc., 301 F.3d 329, 332 n.1 (5th Cir. 2002). To have

---

[76] Doc. 26, Mem., Recommendation, & Order pp. 8-9.

[77] Id. p. 11.

standing, a plaintiff must have suffered "an injury that is concrete, particularized, and actual or imminent; fairly traceable to the defendant's challenged behavior; and likely to be redressed by a favorable ruling." Davis v. Fed. Election Comm'n, 554 U.S. 724, 733 (2008)(citing Lujan, 504 U.S. at 560-61).

In its prior opinion, the court determined that Plaintiff Flores, individually, is the same legal entity as Plaintiff Flores d/b/a TXCAT and that the court has jurisdiction over both the personal claims and those relating to Plaintiff Flores' business interests.[78] The court also determined that the court has jurisdiction over the claims brought by Plaintiff TCRI to the extent that Plaintiff Flores d/b/a TXCAT assigned the claims to Plaintiff TCRI or, alternatively, to the extent that Plaintiff TCRI is a successor in interest to Plaintiff Flores d/b/a TXCAT's claims.[79] The court explicitly left open the door to Defendants' reasserting the challenge to Plaintiff TCRI's standing after discovery, if they found no evidence of assignment or successor-in-interest status.[80]

Upon consideration of Defendants' motion to dismiss, the court considered as true all of Plaintiffs' uncontroverted factual

---

[78]    Id. pp. 9-11.  Plaintiffs submitted an online copy of an assumed-name certificate for TXCAT dated June 25, 2010.  See Doc. 55-9, Ex. 10 to Pls.' Resp. to Defs.' Mot. for Summ. J., Assumed Name Certificate.

[79]    Doc. 26, Mem., Recommendation, & Order pp. 11-12.

[80]    See id. p. 12.

allegations in the complaint.[81]   Now, upon motion for summary judgment, the burden is on Plaintiffs to present competent evidence to support their allegations that Plaintiff Flores d/b/a TXCAT assigned its claims to TCRI or that TCRI is a successor in interest to the claims.

Plaintiffs present no evidence of either.   Instead, they simply assert that it is so: "In this instance, [Plaintiff] Flores, d/b/a TXCAT (assignor), assigned his interest in the business disparagement and tortious interference causes of action to [TCRI] (assignee)."[82]   Plaintiffs devote several pages of their brief to the discussion of case law, but it is not the law on the topic that concerns the court; it is the complete lack of evidence demonstrating standing via either assignment or successor in interest.

Plaintiffs failed to meet their summary judgment burden of demonstrating that Plaintiff TCRI has standing to bring this lawsuit.  All claims brought by Plaintiff TCRI must be dismissed.

### 2.  February Email

Defendants contend that the December 2009 date on the copy of the Newsletter that Mills attached to the February 2010 email to Plaintiff Flores represents the date on which the Newsletter was

---

[81]    See id. pp. 11-12.

[82]    Doc. 55, Pls.' Resp. to Defs.' Mot. for Summ. J. pp. 22-23 (lacking citation to any evidence).

printed from the internet, not the date on which it was posted on the internet.  They argue that the Newsletter was initially posted on the internet on October 29, 2009, and that the statute of limitations runs from that date.  As an additional point, they note that no evidence suggests that Defendants had control over any decision to "republish" the Newsletter.  The court agrees on both counts.

The single publication rule states that only one cause of action arises for damages for libel or any other tort based on a single publication or exhibition or utterance.  Holloway v. Butler, 662 S.W.2d 688, 690 (Tex. App.–Houston [14th Dist.] 1983, writ ref'd n.r.e.)(adopting the uniform single publication act).  In Holloway, the court held that "publication is complete on the last day of the mass distribution of copies of the printed matter," thus starting the running of the limitations period.  Id. at 692.  For internet publications, application of the single publication rule means that the statute of limitations begins to run from the date it was posted.  Nationwide Bi-Weekly Admin., Inc. v. Belo Corp., 512 F.3d 137, 146 (5th Cir. 2007)(applying Texas law and deciding that the single publication rule does apply to internet publications).  "[T]he continued availability of an article on a website should not result in republication, despite the website's ability to remove it."  Id. at 145.

The only competent evidence in the record reflects that the

Newsletter was published initially on October 26, 2009, at the time it was emailed and was posted on the internet on October 29, 2009. Thus, the date on which the statute of limitations began for the Newsletter was no later than October 29, 2009.  Its continued presence on the internet and availability for printing does not alter this result.  See id.

Undeterred, Plaintiffs compare the situation here to the example in Nationwide Bi-Weekly Administration, Inc., 512 F.3d at 146, where the court indicated that an additional cause of action may arise if a defendant republishes defamatory material in another form such as reprinting a hardcover book in paperback form. Plaintiffs contend that Mills' emailing of the Newsletter was a new publication "designed to reach a new audience and thus do new damage."[83]  Even if this argument were a proper application of Fifth Circuit law, it is not supported by the evidence.  Nothing indicates that Defendants emailed the Newsletter in December 2009, as suggested by Plaintiffs.  Relying on the "12/11/09" notation beneath the Newsletter as a date on which Defendants emailed or in any way published the Newsletter is rank speculation.  The date is more likely to refer to when the original source of the photocopy printed it from the internet.  But the significant point is that the photocopy cannot be traced to Defendants.

---

[83]    Id. p. 27 (internal citations omitted)(citing Nationwide Bi-Weekly Admin., Inc., 512 F.3d at 146).

Plaintiffs acknowledge this, perhaps unwittingly, in their own brief:

> There is no definitive evidence to state when the December 2009 publication was first printed. Kevin Mills, the individual who forwarded the email to the Plaintiff, Robert Flores, indicated that he received it from a third party and was not sure what the date on the bottom of the document meant. He could not say where the document was originally obtained, as he obtained it from a third party, who received it from a client.[84]
> Absent evidence of Defendants' republishing the Newsletter,

the single publication rule applies, and the statute of limitations began on October 29, 2009, when Defendants first published it on the internet.

### 3. Statutes of Limitation

Defendants argue that all of Plaintiffs' claims are barred by limitations. The court agrees.

### a. Libel and Tortious Interference Claims

In Texas, libel claims have a one-year statute of limitations. See Tex. Civ. Prac. & Rem. Code § 16.002. A tortious interference claim usually has a two-year statute of limitations under Texas law. See Tex. Civ. Prac. & Rem. Code § 16.003. However, a one-year limitations period attaches "when allegedly defamatory statements form the sole basis" of the claim. Nationwide Bi-Weekly Admin., Inc., 512 F.3d at 146-47 (5th Cir. 2007)(citing Martinez v. Hardy, 864 S.W.2d 767, 776 (Tex. App.-Houston [14th Dist.] 1993, no writ)).

---

[84]    Id. (internal citations omitted).

28

The court previously applied the one-year limitations period to Plaintiffs' libel and tortious interference claims, finding that the latter claims would not survive without the underlying defamation allegations and are, therefore, also subject to the shorter limitations period.[85]  Deciding that the date on which Plaintiffs' claims arose with regard to the October communications was no later than November 9, 2009, (the date of Plaintiffs' cease and desist letter to Defendants) the court dismissed Plaintiffs' libel and tortious interference claims concerning the October communications.[86]

Based on the court's current determination that forwarding the October communications by third parties in December did not restart the limitations period, the court finds that the libel and tortious interference claims should be dismissed in their entirety.

### b.  Business Disparagement Claim

Although business disparagement claims may carry a two-year limitations period, the time frame is shortened to one year if: (1) the gravamen of the complaint is defamatory injury to the plaintiff's reputation, and (2) there is no evidence of direct pecuniary loss to give rise to special damages.  See Dwyer v. Sabine Mining Co., 890 S.W.2d 140, 142-43 (Tex. App.–Texarkana 1994, writ denied)(stating that a plaintiff may sue for both

---

[85]   See Doc. 26, Mem., Recommendation, & Order p. 17.

[86]   See id. pp. 13-14.

defamation and business disparagement if he avoids duplication of damages).  To avoid the one-year statute of limitations, the damages in a business disparagement claim must be a "pecuniary loss that has been realized or liquidated as in the case of specific lost sales."  <u>See</u> <u>Hurlbut v. Gulf Atl. Life Ins. Co.</u>, 749 S.W.2d 762, 767 (Tex. 1987) (citing W. Keeton, <u>Prosser & Keeton on the Law of Torts</u> § 128 at 971 (5th ed. 1984)).  In addition, "the communication must play a substantial part in inducing others not to deal with the plaintiff with the result that special damage, in the form of the loss of trade or other dealings, is established." <u>Id.</u>

Based on Plaintiffs' first amended complaint, which alleged direct pecuniary damages in the form of lost contracts both for past and future business forcing Plaintiffs to resort to more expensive suppliers, the court decided that the two-year limitations period applied to Plaintiffs' business disparagement claim.[87]  In the live pleading, Plaintiffs alleged that Plaintiff Flores d/b/a/ TXCAT "lost existing customers and potential future customers, investors and vendors and . . . incurred additional business expenses."[88]  Plaintiffs further alleged special damages in the form of "loss of profits, and loss of credit and/or investment, loss of goodwill and increased business expenses."[89]

---

[87]    <u>Id.</u> p. 19

[88]    Doc. 32, Pls.' 2nd Am. Compl. ¶ 28.

[89]    <u>Id.</u> ¶ 29.

At this stage in the litigation, Plaintiffs can no longer rely on allegations.  <u>See</u> <u>Celotex Corp.</u>, 477 U.S. at 324.  They must produce some evidence showing the realized or liquidated losses to survive the pending summary judgment motion.  <u>See</u> <u>id.</u>  In their response to Defendants' motion, Plaintiffs point to the deposition testimony of Plaintiff Flores, Tirado, and Prentice and the expert testimony of Trippon,[90] claiming that these witnesses provided proof of specific damages, primarily from "the loss of credit and investment arising from the loss of Claxton Recycling's willingness to invest in an expansion of their business."[91]  Plaintiffs also claim to have lost vendors who sold Plaintiffs catalytic converters, causing Plaintiffs to have to look to foreign sources.  The evidence cited by Plaintiffs, however, falls short of raising a fact issue on whether Plaintiffs suffered a realized or liquidated pecuniary loss or whether Defendants' communications played a substantial part in causing special damages.

With regard to lost credit and financing other than related to building a smelter, Plaintiff Flores testified that he had to spend extra time, including making trips to Dallas, to keep "the deal" with Claxton together[92]  He stated that the relationship with Benton

---

[90]    Plaintiffs also cite Benton's affidavit, but that document has been stricken.

[91]    Doc. 55, Pls.' Resp. to Defs.' Mot. for Summ. J. p. 30.

[92]    Doc. 55-3, Ex. 1 to Pls.' Resp to Defs.' Mot. for Summ. J., Pl. Flores' Dep. p. 235.

was not the same after the Claxton Email, specifically that she was "a little shorter" with him and they did not talk as often.[93] Plaintiff Flores could not state definitively that the change resulted from Defendants' communications, but Benton did tell him that the Claxton Email caused her to "almost pull funding completely" from Plaintiffs.[94]   According to Plaintiff Flores, Benton said that she had "great doubts about what [he] was doing" and "that funding would not be forthcoming and that she was extremely worried about her company being pulled into something of this nature."[95]  Yet, Plaintiff Flores also said that Benton did not believe Defendant Robie and knew that Plaintiff Flores did not "do anything."[96]  Ultimately, though, Plaintiff Flores convinced Benton to continue loaning him money just as she had prior to the communications.[97]  Thus, Plaintiffs did not realize any pecuniary losses in this regard.

Concerning money for the smelter, Plaintiff Flores first approached Benton in 2007, and she told him she was not able to

---

[93]   Id. p. 236.

[94]   Id. pp. 236–37; see also id. p. 183; Doc. 55-10, Ex. 12 to Pls.' Resp. to Defs.' Mot. for Summ. J., Tirado's Dep. pp. 23–24; Doc. 55-11, Ex. 13 to Pls.' Resp to Defs.' Mot. for Summ. J., Benton's Dep. p. 58.

[95]   Doc. 55-3, Ex. 1 to Pls.' Resp to Defs.' Mot. for Summ. J., Pl. Flores' Dep. p. 238.

[96]   Id. p. 239.

[97]   See id. pp. 236, 240; Doc. 55-10, Ex. 12 to Pls.' Resp to Defs.' Mot. for Summ. J., Tirado's Dep. p. 22, 24, 32, 66.

fund the building of a smelter.[98]  In late 2008, though, Benton said

that she was "all for it" and they entered a verbal agreement.[99]

Although they never committed the agreement to writing, Plaintiff

Flores testified that Benton was willing to give him an installment

loan for up to a million dollars to build a smelter, which

Plaintiff Flores estimated would cost between $100,000 and

$125,000, and to build a new facility.[100]  When asked about specific

terms of the agreement, Plaintiff Flores testified, "It was going

to be basically like the installment that's a continuing, but part

of the benefit to her was her converter business would grow twenty

fold in Dallas."[101]  Benton testified that terms of the deal, such

as interest rate or repayment schedule, had never been reached.[102]

In fact, she had no sense of how much it would cost to build or

operate a smelter.[103]

　　　In 2009, nothing was done to make the smelter a reality, there

---

[98]　　Doc. 55-3, Ex. 1 to Pls.' Resp to Defs.' Mot. for Summ. J., Pl. Flores' Dep. pp. 246-47.

[99]　　Id. pp. 247-49.

[100]　　Id. pp. 249, 251, 257; see also Doc. 55-11, Ex. 13 to Pls.' Resp to Defs.' Mot. for Summ. J., Benton's Dep. p. 66.

[101]　　Doc. 55-3, Ex. 1 to Pls.' Resp to Defs.' Mot. for Summ. J., Pl. Flores' Dep. p. 257.

[102]　　Doc. 55-11, Ex. 13 to Pls.' Resp to Defs.' Mot. for Summ. J., Benton's Dep. p. 67.

[103]　　Id. pp. 58, 66.  In early 2012, Prentice had a conversation with Benton about their depositions in this case, and Benton told him that she had an agreement with Plaintiff Flores to fund the building of a smelter.  Doc. 55-12, Ex. 14 to Pls.' Resp to Defs.' Mot. for Summ. J., Prentice's Dep. pp. 91-92.

were no plans or permits, much less the commencement of building.[104]
Benton asked Plaintiff Flores when they were going to build,
according to Plaintiff Flores' testimony, but he was "concentrating
on growing the business" and was not ready to build.[105]  By 2010,
Plaintiff Flores testified, he was closer to being ready, but
Benton called after receiving the Claxton Email and told Plaintiff
Flores that they were not going to follow through with the smelter
and expansion plan.[106]  Tirado testified that Benton told him that
she did not have enough trust in Plaintiff Flores and did not know
if he was "doing something wrong."[107]  Yet, Tirado also testified
that Benton had the money available and was waiting on Plaintiff
Flores to make decisions about the smelter.[108]  Benton testified
that, assuming the money was available,[109] she would loan him the
amount necessary.[110]

     Much of this testimony is inadmissible hearsay, but, even if

---

[104]    Doc. 55-3, Ex. 1 to Pls.' Resp to Defs.' Mot. for Summ. J., Pl.
Flores' Dep. p. 259.

[105]    Id. pp. 259-60.

[106]    Id. pp. 260-61; Doc. 55-10, Ex. 12 to Pls.' Resp to Defs.' Mot. for
Summ. J., Tirado's Dep. p. 25.

[107]    Doc. 55-10, Ex. 12 to Pls.' Resp to Defs.' Mot. for Summ. J.,
Tirado's Dep. p. 25; see also id. pp. 29-30.

[108]    Id. pp. 46-47.

[109]    Benton explained that factors such as the market conditions and
wanting to help her kids played roles in deciding whether the money was
available.  Doc. 55-11, Ex. 13 to Pls.' Resp to Defs.' Mot. for Summ. J.,
Benton's Dep. p. 90.  She said that it had nothing to do with Plaintiff Flores
or the way he did business.  Id.

[110]    Id. p. 67.

it could be presented in admissible form, it is simply too equivocal and nonspecific to show specific damages. Plaintiffs' expert report cannot remedy this problem. He calculated damages based on what Plaintiffs stood to gain from operating a smelter over the course of twenty years.[111] Without addressing the expert's qualifications or methods, the court finds the report insufficient to create a fact issue on special damages because it is based on the same testimony that fails to provide sufficient specificity regarding the details of the smelter and facility project. Absent developed contract terms, any damage calculation based on the failure to complete the project is nothing more than speculation. It is not proof of realized or liquidated losses as required to avoid the one-year statute of limitations for business disparagement.

Finally, Plaintiffs assert that they lost customers and had to turn to foreign sources at higher risk and transportation expense.[112] In addition to Plaintiff Flores' testimony, Plaintiffs cite a list of venders for 2009-2011. The court has determined that the vendor list was not properly authenticated and is not admissible. Regardless, pointing generally to changes in vendor lists does not get Plaintiffs were they need to be. Plaintiffs

---

[111]   See generally Docs. 55-18 & 55-19, Ex. 16 to Pls.' Resp. to Defs.' Mot. for Summ. J., Am. Expert Report of Pls.' Expert Witness.

[112]   Doc. 55-3, Ex. 1 to Pls.' Resp to Defs.' Mot. for Summ. J., Pl. Flores' Dep. p. 280.

point to no specific lost vendor and, perhaps more importantly, cannot tie the loss of any one of them to Defendants' communications.[113]   In fact, Plaintiff Flores testified that he could not point to any contract or lost sale that he could say was caused by Defendants' communications and that the vendors did not state why they would no longer sell to him.[114]   Plaintiffs fail to offer any evidence of specific lost vendors to raise the issue of special damages resulting from vendors refusing to conduct business with Plaintiffs as a result of Defendants' communications.

The bottom line is that Plaintiffs' evidence fails to raise a question of fact on the issue of special damages.   Therefore, Plaintiffs are not entitled to a two-year limitations period.   The business disparagement claim, like Plaintiffs' other remaining claims, is subject to a one-year limitations period.   As the court has already determined that the December email did not restart the clock, the court finds that Plaintiffs' business disparagement claim is also barred by limitations.[115]

Plaintiffs' libel, tortious interference, and business

---

[113]   See id. pp. 244-45, 281-82.

[114]   Id.

[115]   Plaintiffs devote several pages of their response arguing their entitlement to equitable tolling of the applicable statutes of limitations.   The court already decided this issue, finding that the procedural history of Plaintiffs' prior lawsuit conclusively showed that Plaintiffs were not entitled to equitable tolling.   See Doc. 26, Mem., Recommendation, & Order pp. 14-16 (finding that Plaintiffs did not pursue their rights diligently and that no extraordinary circumstance stood in the way of timely filing).   Nothing has changed; Plaintiffs are not entitled to equitable tolling.

disparagement claims must be dismissed.

## IV.   Conclusion

Based on the foregoing, Defendants' motion to strike Benton's affidavit is **GRANTED**.   The court further **RECOMMENDS** that Defendants' motion for summary judgment be **GRANTED**.  If the court's recommendation is adopted, the case will be dismissed entirely, and the motion to strike Plaintiffs' expert will be moot.   Thus, Defendants' motion is **DENIED AS MOOT**.   Should the court's recommendation not be adopted, the court will reconsider the ruling at that time.

The Clerk shall send copies of this Memorandum, Recommendation, and Order to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13.  Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically.   Copies of such objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas, this $\underline{14^{th}}$  day of February, 2013.

Nancy K. Johnson
United States Magistrate Judge

37